O
JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| CALMAT CO. dba VULCAN, MATERIALS CO., WESTERN DIVISION, <br><br> Plaintiff, <br><br> vs. <br><br> SAN GABRIEL VALLEY GUN CLUB, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) No. EDCV 08-1198-JLQ <br> ) <br> ) MEMORANDUM OPINION AND <br> ) ORDER <br> ) <br> ) <br> ) <br> ) <br> ) |

BEFORE THE COURT is Plaintiff's Motion for Partial Summary Judgment (ECF No. 55) and Defendant's Motion for Summary Judgment (ECF No. 60). Oral argument was heard on the motions in Riverside, California on June 27, 2011. Plaintiff was represented by Kenneth Ehrlich and Paul Kroeger. Defendant was represented by William Lee Smith and Scott Franklin.

**I. Introduction**

Plaintiff Calmat Co. (herein "Vulcan") owns the Property at issue and also owns an adjacent quarry. Vulcan is one of the largest, if not the largest, miners of stone, sand, and gravel in quarries throughout the United States. Defendant San Gabriel Valley Gun Club (herein "Gun Club") leased the Property from Vulcan for use as a firing range for approximately 60 years (from 1947 to 2006). The lease agreement was periodically renegotiated and renewed. From 1947 to 1961 the Vulcan lease of the Property speaks

ORDER - 1                                1

of use of the Property for a firing range. From 1970 and thereafter, the Vulcan leases contained specific language restricting the use of the Property to "only as a Pistol, Rifle, Trap and Skeet range. . . " There were a total of eight lease agreements over the 60 years, with the most recent being 1992, which was amended by the First Amendment to the 1992 Lease (ECF No. 1, p. 141). The First Amendment to the 1992 Lease was executed in May 2002, and only changed the term (to 18 months) and rate of the 1992 Lease. The Amendment made no mention of any cleanup obligations upon termination of the Lease.

In the late-1980's/early-1990s, Vulcan began depositing mining tailings and overburden from the adjacent quarry on the area of the Property where the discharged bullets came to rest. Vulcan deposited hundreds of thousands of tons of material–thus burying some of the spent bullets and also creating a large hillside, or berm, into which bullets were fired.

Vulcan provided notice of its intent to terminate the Lease on or about May 4, 2005. The Lease was terminated on or about November 6, 2006. The Gun Club admits that its use of the Property resulted in the deposit of bullets, including lead bullets, on the Property. (ECF No. 64, p. 6). The Gun Club also admits that when it turned over the Property at the end of the Lease "there were casings and spent bullets (including spent lead bullets and portions thereof) present at the Property." (ECF No. 64, p. 11).

There is some factual dispute over what the Gun Club did to 'clean' the Property during the years of the Lease. The court need not resolve this dispute and it is not material to the court's decision herein. Vulcan characterizes Gun Club's efforts as inconsistent and sporadic. Gun Club states it regularly swept up casings and that on a less regular basis bullets were recovered and recycled. After the 1992 Lease terminated, the Gun Club also hired Fred Wooldridge to remove and recycle bullets, but Vulcan did not think this was adequate and stopped him from working on the Property. Mr. Wooldridge was on the Property with three truckloads of equipment, but Vulcan did not allow him to commence work. (ECF No. 63-1, Ex. K). In late-2006/early-2007, Gun

Club proposed to remediate the Property in accord with the EPA's Best Management Practices for Lead at Outdoor Shooting Ranges, but Vulcan did not think this was sufficient. (ECF 1, ¶ 43-44).

The Gun Club admits that at the time of Lease termination it did not have sufficient funds to undertake the cleanup efforts proposed by Vulcan. The parties proposed experts have made estimates ranging from under $1.0 million upwards to $7 million to conduct remediation efforts. (See ECF No. 72, at Exhibits T & W). Vulcan has not entered into any contract to clean up the Property and there is no pending federal, state or local regulatory action demanding that Vulcan clean up the Property.

**II. Claims**

There are numerous claims and counterclaims. Vulcan filed a 15-count Complaint that with attachments exceeds 140 pages. Vulcan asserts claims under CERCLA, claims under California's Hazardous Substance Act, asserts breach of contract (the Lease), nuisance, trespass, negligence, waste, and seeks declaratory relief. (ECF No. 1). Gun Club's Counterclaim (filed twice at ECF No. 9 & 19) asserts 8 claims, including under CERCLA, California's Hazardous Substance Act, negligence, and breach of contract. The only federal claim giving this court jurisdiction over this action is the asserted CERCLA claim. The California state law claims are voluminous and somewhat complex.

**III. Motions**

Vulcan's Motion (ECF No. 55) seeks partial summary judgment in its favor on only the state law claims for breach of contract, nuisance, trespass, and waste. It also seeks judgment against Gun Club on Gun Club's counterclaim for breach of contract.

Gun Club's Motion (ECF No. 60) argues that the CERCLA claims should be dismissed because Vulcan has failed to comply with the National Contingency Plan ("NCP") and has not demonstrated a commitment to a CERCLA quality cleanup. Gun Club requests the court dismiss the federal CERCLA claims and decline jurisdiction over the state law claims.

**IV. Discussion**

**A. Plaintiff's CERCLA claims**

ORDER - 3  3

Vulcan's CERCLA claims are the sole basis for jurisdiction in this court, and the Gun Club argues they are unripe, should be dismissed, and this court should decline to exercise jurisdiction over the remaining state law claims. Accordingly, this court begins its analysis with determination of this issue as it could render unnecessary this court's attention to the remaining state law claims.

The elements of a CERCLA Section 107 response cost claim are: 1) the area on which hazardous substances are found must constitute a defined "facility"; 2) a "release" or "threatened release" of a hazardous substance has occurred; 3) the plaintiff has incurred "response costs" that are "necessary" and "consistent with the National Contingency Plan ("NCP"); and 4) the defendant is among one of the four classes of persons subject to liability. *SPPI-Somersville, Inc. V. TRC Companies, Inc.*, 2009 WL 2612227 (N.D. Cal. 2009) citing 42 U.S.C. § 9607(a)(4)(B) and *Carson Harbor Village Ltd. v. Unocal Corp.*, 227 F.3d 1196 (9th Cir. 2000).

The Gun Club challenges both that the shooting range is a "facility" and that Vulcan has incurred response costs that are consistent with the NCP. The term "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." However, it "does not include any consumer product in consumer use." 42 U.S.C. § 9601(9). Gun Club's argument must be that the bullets are a consumer product in consumer use at a shooting range and thus the range is not a "facility." There apparently is very little authority addressing this precise question. Gun Club relies on the District Court opinion in *Otay Land Co. v. U.E. Limited*, 440 F.Supp.2d 1152 (S.D. Cal. 2006) (which was vacated by the Ninth Circuit on other grounds). Vulcan relies on *Kamb v. United States Coast Guard*, 869 F.Supp. 793 (N.D. Cal. 1994). However, in *Kamb* the court stated there was "no dispute" among the parties that the shooting range was a "facility." Therefore the court did not decide the issue. Fortunately, this court need not resolve the novel question of law concerning whether a gun range is a "facility" for purposes of CERCLA liability.

ORDER - 4                                          4

### B. Ripeness of the CERCLA claims

The Gun Club argues that Vulcan's clean up efforts to date are not consistent with the National Contingency Plan ("NCP") and Vulcan is not committed to a CERCLA-quality cleanup. Gun Club also argues that Vulcan's claims for declaratory relief as to future costs are unripe because Vulcan has not established liability for past costs, and that Vulcan's contribution claims are unripe because Vulcan has not been sued for cost recovery.

In response to Gun Club's Motion for Summary Judgment, Vulcan did not offer evidence as to the amount of the costs incurred to date. It is undisputed that Vulcan has not commenced cleaning up the Property, despite the fact that the Lease with the Gun Club terminated over four years ago. A declaration by Michael Linton, a Vice-President of Vulcan, states that they have preserved the Property in the same state as when the Lease terminated, stating Vulcan "has preserved the area in front of the firing lines of the pistol and rifle ranges, as well as the impact areas, as near possible to the condition they were in when the Gun Club left." (ECF No. 71 at 5). Counsel for Vulcan, at oral argument, conceded that no federal, state, or local governmental agency is pursuing an enforcement action concerning the Property.

Other than hiring experts during this litigation, the only discernible effort of Vulcan is the "preliminary environmental inspection" conducted by ENV America who it hired in 2004. (ECF No. 72-2, Ex. R; ECF No. 72-3, Ex. U). In its responsive memorandum, Vulcan sets forth that it has done four things:

1) obtained two separate site investigators to suggest methods of remediating the Property potentially in compliance with NCP;

2) consulting with the City of Azusa concerning disposition of the Gun Club Property as required by NCP;

3) retaining an expert to evaluate the health risks associated with the property and the need for remediation;

ORDER - 5                    5

4) rejected the Gun Club's proposed remediation because it did not comply with the NCP.

(ECF No. 67, p. 15). While Vulcan may have looked at "potentially" NCP compliant remediation plans, consulted with the City of Azusa re: some structures on the Property, hired an expert for litigation, and rejected the Gun Club's proposed cleanup, none of this establishes that Vulcan has incurred or committed to necessary response costs consistent with the NCP.

This case resembles *Otay Land Co. v. United Enterprises*, 338 Fed.Appx. 689 (9th Cir. 2009)(unpublished), another case involving a shooting range, where the Ninth Circuit stated: "Because no public agency had indicated the need for remediation of the subject property and Otay has not demonstrated a reliable basis for its claimed remedial costs, this case is not ripe for judicial review." *Id.* at *1. Similarly here no public agency has indicated the need for remediation, and although Vulcan has expert projections of clean up costs, it has not begun cleanup or incurred cleanup costs.

The court acknowledges a governmentally authorized cleanup program is not a prerequisite to a private action under Section 107(a) of CERCLA. *Wickland Oil v. Asarco, Inc.*, 792 F.2d 887 (9th Cir. 1986); *Cadillac Fairview v. Dow Chemical*, 840 F.2d 691 (9th Cir. 1988). However, in both these cases, the district court had dismissed the action for failure to state a claim. Here, at the summary judgment stage, Vulcan has had the opportunity to present evidence that the action is ripe for review. Additionally, dismissing the action based on ripeness will allow Vulcan to pursue a CERCLA action at a later date, if in fact Vulcan does proceed with an NCP compliant response and incurs necessary response costs.

The court recognizes that a party does not have to complete a cleanup prior to bringing a CERCLA action. There is some authority that "testing expenses" qualify as response costs (*Wickland Oil*) and that "testing and security expenditures" can constitute response costs (*Cadillac Fairview*). However, "Under CERCLA's scheme of private

ORDER - 6                                     6

action, response costs may not be recovered when there has been no commitment of resources for meeting these costs. Section 9607(a)(4)(B) permits an action for response costs "incurred" - not "to be incurred." *In re Dant & Russell*, 951 F.2d 246, 249 (9th Cir. 1991).

The Ninth Circuit stated in *In re Dant & Russell*, that the statute,

"envision[s] that, before suing, CERCLA plaintiffs will spend some money responding to an environmental hazard. They can then go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job." *Id.* at 249-250.

The Ninth Circuit further explained the process for a private CERCLA action:

> This system strikes a balance between a number of considerations. By **requiring a plaintiff to take some positive action before coming to court**, CERCLA ensures that the dispute will be ripe for judicial review. On the other hand, by not requiring plaintiffs to perform a full cleanup before coming to court, and by expressly providing for declaratory judgments, CERCLA substantially reduces the risk involved in performing the cleanup. This encourages private response. Similarly, actual cleanup is encouraged by **requiring plaintiffs to incur response costs before they can recover them**. Since CERCLA places no strings on an award of response costs, **allowing recovery for future costs absent any binding commitment to incur these costs would leave no incentive to complete the cleanup.**
> This case provides no occasion for defining what "incurred" means-only what it does not mean. Here, we are presented with nothing but bare assertions by BN that BN will perform future cleanup. These assertions do not amount to response costs.

*Id.* at 250 (internal citations omitted)(emphasis added).

Thus a plaintiff must "take some positive action" and incur some response costs prior to filing suit. Vulcan has not provided any evidence as to an amount of actual response costs incurred. Vulcan may have incurred some minimal amount of recoverable costs at this point, primarily for litigation purposes, but has not demonstrated the amount of such costs or that they are "necessary" and consistent with the NCP. Vulcan has not demonstrated a binding commitment to incur cleanup costs or shown that there is any action or demand by a federal, state or local authority to clean up the site. Vulcan

ORDER - 7                                              7

offered only the self-serving declaration of Michael Linton, a Vulcan vice-president who makes the conclusory assertion that "Vulcan will not abandon the Property and is committed to seeing the Property properly remediated." (ECF No. 71, ¶ 18). This is not a "binding" commitment.

In order to establish a private party CERCLA claim, a party must incur response costs that are necessary and consistent with the national contingency plan. *City of Colton v. American Promotional*, 614 F.3d 998 (9th Cir. 2010) "Response costs are considered necessary when an actual and real threat to human health or the environment exists." *Id.* Response costs are consistent with the NCP "if the action, when evaluated as a whole, is in substantial compliance" with the NCP. *Id.*

In *City of Colton*, the City alleged it had spent $4 million to investigate contamination and implement a wellhead treatment program. The district court granted summary judgment for defendants finding that the City could not prove the costs were consistent with the NCP, and because the City failed in that showing, it was not entitled to declaratory relief as to future costs. On appeal, the City conceded that it had not complied with the NCP as to past response costs.

The Ninth Circuit then turned to: "Whether a CERCLA plaintiff's failure to establish liability for its past costs necessarily dooms its bid to obtain a declaratory judgment as to liability for its future costs" *Id.* at 1006. The Circuit found CERCLA did not provide such relief: "Providing declaratory relief based on mere assurances of future compliance with the NCP would create little incentive for parties to ensure that their initial cleanup efforts are on the right track." *Id.* at 1008.

Recovery under CERCLA is for costs incurred, that were necessary, and that were incurred in a manner consistent with the NCP. The case law speaks of a "commitment" to complete the cleanup, rather than just bare assertions. In rejecting a request for a declaration as to future response costs when the plaintiff had not incurred proper past response costs, the *City of Colton* court stated: "We conclude that CERCLA's purpose would be better served by encouraging a plaintiff to come to court only after demonstrating its commitment to comply with the NCP and undertake a CERCLA-quality

ORDER - 8                                            8

cleanup." *Id.* This court finds, on this record, that Vulcan has not demonstrated its commitment to a CERCLA-quality cleanup or shown that its actions to date are NCP compliant. If Vulcan later demonstrates compliance with the NCP and/or undertakes a CERCLA quality cleanup, it can then initiate an appropriate action against the Gun Club. To allow such an action now, with no such commitments, risks a possible recovery from the Gun Club which would then go into the treasury of Vulcan without any assurance that the recovery would be used for a NCP cleanup.

This court also finds persuasive the analysis in *Walnut Creek Manor v. Mayhew Center*, 622 F.Supp.2d 918 (N.D. Cal. 2009), where plaintiff moved for partial summary judgment as to liability under CERCLA and defendant opposed the motion arguing that plaintiff had not incurred necessary remedial costs. The court stated:

> WCM does not claim that it has performed a CERCLA-quality cleanup or that its site investigation is sufficient as is. Rather, WCM argues that it does not have to perform these activities to be "consistent" with the NCP because all of its efforts thus far "will undoubtedly play a significant role in the election of a remediation effort." The clear language of the NCP reveals that a plaintiff cannot collect costs when it has performed some of the NCP requirements. By merely performing a few investigations of a hazardous site, WCM has not "substantially complied" with the entirety of the NCP. Moreover, because a CERCLA-quality cleanup has not even begun, WCM cannot carry its burden to show that its efforts have "resulted in a CERCLA-quality cleanup." WCM's response costs are not "consistent" with the NCP. However, the Court notes that these costs may be recoverable when the cleanup is completed and WCM shows that it substantially complied with the NCP. *Id.* at 930-31.

Similarly, it is undisputed that Vulcan has not begun a "CERCLA-quality cleanup", but rather has just done some investigation and testing, primarily for the purposes of this litigation. The court in *Walnut Creek Manor* found that a "few investigations" is not substantial compliance with the NCP. In this case Vulcan employee and geologist, Brian Anderson, states he has made "several inspections" of the Property. (ECF No. 70). These inspections appear to be walking around the Property and observing bullets and casings. While "strict" compliance with the NCP is not required,

ORDER - 9    9

1  "substantial" compliance is required. In Response to Gun Club's Fact #49, Vulcan
2  admits it has not conducted a remedial investigation/feasibility study as set forth under
3  the NCP. See 40 CFR 300.430(c). "The National Contingency Plan requires that the
4  party seeking recovery provide an opportunity for public comment and participation,
5  conduct a remedial site investigation, and prepare a feasibility study." *Otay Land Co. v.*
6  *United Enterprises*, 338 Fed.Appx. 689 (9th Cir. 2009)(unpublished) citing *Carson*
7  *Harbor Vill. v. County of L.A.*, 433 F.3d 1260, 1266 (9th Cir. 2006).

8  In *Otay Land Co.*, the Ninth Circuit stated: "Because no public agency had
9  indicated the need for remediation of the subject property and Otay has not demonstrated
10 a reliable basis for its claimed remedial costs, this case is not ripe for judicial review." *Id.*
11 at *1. In this case, Vulcan's counsel at oral argument admitted that no public regulatory
12 agency is involved. Vulcan has presented no evidence to substantiate that it has incurred
13 necessary response costs in substantial compliance with the NCP. Vulcan has not
14 demonstrated a binding commitment to remediate the Property even if it were to recover
15 a judgment against the Gun Club on its CERCLA or state law claims.

16 As the CERCLA claim is unripe, this court lacks jurisdiction over the claim and
17 it must be dismissed. *Southern Pacific Transp. Co. v. Los Angeles*, 922 F.2d 498, 502 (9th
18 Cir. 1990) ("If a claim is unripe, federal courts lack subject matter jurisdiction and the
19 complaint must be dismissed."); *National Park Hospitality Assoc v. Dept. of Interior*, 538
20 U.S. 803, 808 (2003) ("The ripeness doctrine is drawn both from Article III limitations
21 on judicial power and from prudential reasons for refusing to exercise jurisdiction.").
22 The CERCLA claims shall be dismissed.

23  **V.  Supplemental Jurisdiction Over State Law Claims**

24 Gun Club argues that if the court determines that the CERCLA claim is unripe and
25 should be dismissed, as it has determined, the court should decline supplemental
26 jurisdiction over the state law claims and dismiss them. Vulcan opposes this, arguing that
27 judicial economy (given the age of the case) favors this court retaining jurisdiction. Gun
28 ORDER - 10                                      10

Club counters that this matter has been assigned to three different federal judges, and this judge was assigned the case quite recently, in April 2011. Thus, the Gun Club argues this court does not have extensive familiarity with the matter and therefore a newly assigned state judge would be in a similar position. The Gun Club additionally argues that no substantive motions have yet been determined. However the parties have briefed and argued the pending cross-motions for summary judgment.

Under 28 U.S.C. § 1367(c)(3) this court may decline to exercise supplemental jurisdiction over state law claims if it has "dismissed all claims over which it has original jurisdiction." The Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966), stated that supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." Ordinarily, where the state law claims are dismissed prior to trial, "the state law claims should be dismissed as well." *Id.* The parties raise numerous state law claims, which may be more appropriately decided in state court. As the Supreme Court stated: "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties". *Id.* The court has considered the course of litigation in this court, and recognizes that the parties have engaged in extensive discovery. This discovery should be utilized to expedite the state court proceedings, or perhaps may be utilized in reaching settlement of the parties' dispute.

This court declines to retain jurisdiction over the remaining state law claims, and this action will be dismissed in its entirety.

### VI. Conclusion

In the over four years since the 1992 Lease was terminated and Gun Club vacated the Property, Vulcan has not commenced or contracted for cleanup. Further, Vulcan has not demonstrated convincingly a commitment to perform an NCP compliant cleanup. In fact, there are considerations that cast doubt on Vulcan's intent. First, the fact that cleanup has not commenced. Second, the fact that Vulcan impeded Gun Club's efforts to clean up surface bullets via reclamation and recycling performed by Wooldridge. Even

if Wooldridge's cleanup alone would not have been sufficient, it seems that removing the bullets would be a first step in remediation efforts. Third, Vulcan admitted at oral argument that its actions in dumping overburden at the site had increased response costs–although by what measure has not been quantified. Fourth, Vulcan admits it has not conducted a remedial investigation/feasibility study. And fifth, in a recently filed Joint Status Report (ECF No. 62), Vulcan stated: "Vulcan wishes to advise the Court that, in the event Summary Adjudication is granted as to liability on any of its claims for relief, it intends to dismiss the remaining causes of action leaving only the issue of damages to be tried. This will substantially reduce the estimated time trial of this case will require." (ECF No. 62, p. 11). Vulcan only moved for summary judgment as to some of its state law claims. Thus if Vulcan were to prevail, for example on its claim for breach of the 1992 Lease, it would be content to dismiss its remaining claims, including the CERCLA claim. Vulcan could then take its damages on the Lease claim, there would be no judgment as to CERCLA claim, and Vulcan would not be committed by the Judgment to perform a CERCLA quality cleanup.

The CERCLA claim is not ripe for review. In the event that Vulcan commences a cleanup in substantial compliance with the NCP, it may in the future bring an action for recovery under CERCLA. As the court is dismissing the only basis for federal jurisdiction, it also declines to exercise supplemental jurisdiction over the remaining state law claims. Gun Club's Counterclaim (ECF No. 9 & 19) also asserted claim(s) under CERCLA for contribution and declaratory relief. Those claims are necessarily unripe as well, and the court declines supplemental jurisdiction over the state-law counterclaims.

**IT IS HEREBY ORDERED**:

1. Gun Club's Motion for Summary Judgment (ECF No. 60) is **GRANTED**. Vulcan's CERCLA claims are not ripe for adjudication for the reasons stated herein.

2. The Clerk of the Court shall enter Judgment dismissing the Complaint, and claims therein and all Counterclaims, without prejudice, for lack of subject matter

ORDER - 12                                             12

jurisdiction.

3. The court does not reach the merits of Vulcan's Motion for Partial Summary Judgment (ECF No. 55), which presented only state law claims, and therefore that Motion is **DENIED AS MOOT**. The court declines to exercise supplemental jurisdiction over the state law claims.

4. The court makes no judgment as to the merit of any of the state law claims asserted by Vulcan, or asserted by Gun Club in its Counterclaims.

**IT IS SO ORDERED**. The Clerk of the court is directed to enter this Order, enter Judgment of dismissal without prejudice for lack of jurisdiction, furnish copies to counsel, and close this file.

Dated August 22, 2011.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 13                    13